**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|                                                      |     |                               |
| ---------------------------------------------------- | --- | ----------------------------- |
| **ADAM BEECH, *et al.*,**                            | )   |                               |
|                                                      | )   |                               |
|     **Plaintiffs,**              | )   |                               |
|                                                      | )   |                               |
| **v.**                                               | )   | **CIVIL ACTION 14-0241-WS-B** |
|                                                      | )   |                               |
| **FV WISHBONE, her tackle, furniture,**              | )   |                               |
| **apparel, equipment, and appurtenances,**           | )   |                               |
| **etc., *in rem*,**                                  | )   |                               |
|                                                      | )   |                               |
|     **Defendant.**               | )   |                               |

**ORDER**

    This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 63).  The Motion has been briefed and is now ripe for disposition.[1]

**I.    Nature of the Case.**

    Plaintiffs, Adam Beech, Tenley Warhurst, and Kris Leith, commenced this *in rem* action on May 29, 2014, to enforce maritime liens against defendant, the fishing vessel F/V WISHBONE, her tackle, furniture, apparel, equipment and appurtenances, etc. (the "Vessel"). The well-pleaded allegations of the Verified Complaint (doc. 1) filed by Beech and Warhurst, as

---

[1]    The parties have made the task of summary judgment review more onerous than necessary by failing to comply with the Rule 16(b) Scheduling Order's requirement that "[i]f a party's exhibits in support of or in opposition to a motion exceed fifty (50) pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery."  (Doc. 35, ¶ 13(c).)  Movant relies on more than 100 pages of exhibits and plaintiffs collectively submit more than 170 pages of exhibits; however, neither side has provided courtesy copies.  Also, plaintiffs have cluttered the court file with three separate summary judgment responses (docs. 69-71), significant portions of which are identical, thereby forcing the Court and opposing counsel to sift through the same text three different times.  The clutter extends to the exhibits.  Each plaintiff has filed exhibits and deposition excerpts that not only duplicate each other's, but also substantially overlap those filed by defendant.  The net result is that there are as many as four copies of certain exhibits in the court file, complicating efforts to locate and review pertinent materials.  In its discretion, the Court will consider the parties' filings notwithstanding these defects.

well as the Verified Complaint in Intervention (doc. 9) subsequently filed by Leith, reflect that plaintiff Beech seeks to recover $25,000 that he claims to be owed for services and supplies provided to the Vessel in May 2013; that plaintiff Warhurst seeks to recover $25,000 that she claims to be owed for services and supplies provided to the Vessel in May 2013; and that intervenor-plaintiff Leith seeks to recover $4,000 that he claims to be owed for services and supplies provided to the Vessel in May 2013.  The present owner of the Vessel, non-party Skipper's Landing, Inc., is appearing in this matter for the limited purpose of defending on the Vessel's behalf.  Skipper's Landing denies that plaintiffs have valid, enforceable maritime liens for these services and supplies, and further interposes various affirmative defenses.

## II.    Relevant Background.[2]

### A.    Ownership History of the Vessel.

Prior to May 2013, the Vessel was owned by non-party B&D Maritime, Inc., which utilized it in connection with activities in the fishing and boat charter industries in Orange Beach, Alabama.  (Doc. 63, Exh. 1.)  On May 28, 2013, B&D Maritime entered into a "Lease/Agreement to Purchase" with an entity called Davy Jones Fishing Charters, LLC ("Davy Jones LLC").  (Id.)[3]  By the terms of this Lease/Agreement to Purchase, Davy Jones LLC was to lease the Vessel from B&D Maritime through the closing date of September 19, 2013, at which time the purchase would be finalized and title would pass to Davy Jones LLC.  The buyer intended to use the Vessel to perform charter fishing operations.  The parties to the Agreement acknowledged that, during the lease period, "work to vessel may be performed to 'make ready'

----

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [plaintiffs'] version of the facts drawing all justifiable inferences in [their] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[3]    Davy Jones LLC was comprised of members Gene Warhurst and David Jones, who formed this entity for the purpose of acquiring and operating the Vessel.  (Doc. 71, Exh. 1, ¶ IX; doc. 63, Exh. 4, ¶ 15.)

for upcoming fishing season." (Doc. 63, Exh. 1.)  This lawsuit, and the maritime liens asserted by plaintiffs pursuant to 46 U.S.C. § 31342, arise from certain "make ready" work that plaintiffs allegedly performed for Davy Jones LLC during that lease period.

For reasons not germane to this lawsuit, the contemplated closing as between B&D Maritime and Davy Jones LLC never took place.[4]  Instead, B&D Maritime entered into a new Purchase Agreement with Skipper's Landing on October 17, 2013, pursuant to which Skipper's Landing agreed to close on the purchase of the Vessel within 30 days.  (Doc. 63, Exh. 2.)  Skipper's Landing delivered a sizeable down payment on the date of that Purchase Agreement, and wired the balance of the purchase price two days later, on October 19, 2013.  The Bill of Sale for that transaction is dated October 21, 2013.  (Doc. 63, Exh. 4, ¶ 37.)  From that time through the present, Skipper's Landing has owned and operated the Vessel.

### B.    Services/Supplies Provided by Plaintiff Beech.

Plaintiff Adam Beech seeks to enforce a maritime lien against the Vessel for work that he characterizes as follows: "We went in and completely renovated the cabin on that boat."  (Beech Dep., at 9.)  According to Beech, these renovations included removal of seats, walls and ceilings; rebuilding of benches; installation of cabinets, plywood for ceilings, lights, and electrical wiring; and the like.  (Id.)  Beech was hired to perform this work by Gene Warhurst ("Mr. Warhurst"), a member of Davy Jones LLC.  Beech's understanding was that, in exchange for these services, he would not be paid directly, but instead "would have twenty-five thousand dollars interest in the boat," meaning that he would be granted a share interest in the Vessel by virtue of his work and labor.  (Id. at 10-11.)  Beech elaborated that his efforts were "an investment in the boat, because it was an ongoing business starting up as a charter business, and I would have a stake of interest in that business."  (Id. at 11.)  The parties did not reduce this agreement to writing because Beech

---

[4]        Efforts to affix blame and delineate financial accountability for the implosion of the B&D Maritime / Davy Jones LLC transaction are ongoing in state-court litigation captioned *Davy Jones Fishing Charters, LLC; Ernest E. Warhurst, Jr., individually and as parent and next friend on behalf of Kathleen Warhurst, a minor; Lorrie Johnson, as parent and next friend on behalf of Matthew Johnson, a minor v. Randy Boggs, Susan Boggs, David Jones, B&D Maritime Inc., and Skippers Landing Inc.*, Case No. CV 2013-901412, pending in the Circuit Court of Baldwin County, Alabama.  (*See* doc. 63, Exh. 4.)  Adam Beech, Tenley Warhurst, and Kris Leith are not named parties in the state-court litigation, and apparently have no direct involvement in same.

"was going through a divorce at the time" and "didn't want to show me having any ownership in the boat or ownership in anything until I got my divorce settled, because it would just be something else I had to fight over." (*Id.* at 12.) By the time Beech's divorce proceeding had concluded, in his words, "the boat had vamoosed," so Beech never documented this agreement with Mr. Warhurst. (*Id.* at 18.)

Beech's expectation was that the services he provided to renovate the Vessel's cabin were simply an "initial investment" in the fishing charter business and that he would "eventually, invest more in it, too. And if the boat continued to do good and make money, then I would begin to draw a percentage of profits out of it." (*Id.* at 13.) Beech viewed the supplies and services he provided to the Vessel as "a long-term investment," but also believed that if things went wrong, he could "get some money out of it one way or the other," presumably referring to the maritime lien he now asserts against the Vessel. (*Id.* at 14.) Prior to filing suit in this case on May 29, 2014, Beech never claimed or demanded payment from anybody for his work on the Vessel in May 2013, because he understood that "we may get the boat back" and resume the previously described long-term investment plan. (*Id.* at 14-15.) Moreover, given Beech's stated "goal" of investing in the Vessel, he "really wasn't worried about keeping up with time and materials" in the course of performing the cabin renovation services. (*Id.* at 15-16.) Beech has maintained neither invoices nor other records showing the money and time he expended in performing that work. (*Id.* at 17.)

### C.    *Services/Supplies Provided by Plaintiff Warhurst.*

Plaintiff Tenley Warhurst ("Warhurst") is the wife of Gene Warhurst, who is both a member of Davy Jones LLC and a practicing attorney. (Warhurst Dep., at 9.) On "numerous, numerous times," Warhurst loaned her own money to Mr. Warhurst's law practice (the "Law Practice") to avoid the need for Mr. Warhurst's firm to draw on a line of credit. (*Id.* at 20, 26-27.)[5] She made these loans to the Law Practice as "general loans," without earmarking them for the Vessel or for any other specific purpose; however, in lieu of demanding reimbursement for certain of those loans, Warhurst authorized the Law Practice to "use that money to go to the boat to be able to buy these supplies to get it started." (*Id.* at 26-27.) As Warhurst put it in her

---

[5]     Warhurst explained that she had her own "personal savings" funds that were separate and apart from marital or joint accounts maintained with Mr. Warhurst. (*Id.* at 25.)

deposition, "instead of having to pay that money back to me, I was kind of vested in this boat venture after we got it going." (*Id.* at 20.)[6] She further explained as follows: "I agreed that we could take the money that [the Law Practice] owed to me to buy supplies for the [Vessel] in order to get that business up and going as fast as possible to be able to make some money at that business." (*Id.* at 92.) Warhurst had recently left a job in the pharmaceutical industry, and wanted to "be able to participate more" in the contemplated charter fishing business of the Vessel, "just being able to run the business" when it became operational. (*Id.* at 97.)

Under this system, instead of repaying Warhurst for her loans to the Law Practice, the Law Practice would disburse those funds to Davy Jones LLC as a loan for the latter to use to purchase supplies for the Vessel. (*Id.* at 20-21, 25.) Because Warhurst personally "handle[s] the books" and is "in charge of the money" for the Law Practice, she pays herself back for her loans to the Law Practice as and when she deems appropriate. (*Id.* at 29.) Warhurst also testified that many items she provided to the Vessel "are directly from [her] personal accounts," and that other supplies were funded via means such as (i) rental income checks that she and Mr. Warhurst ordinarily would have deposited in their joint personal accounts, (ii) joint credit card accounts held by Warhurst and Mr. Warhurst, or (iii) a business account for a "little business" owned by Warhurst that "never really did anything." (*Id.* at 28, 37, 50, 54, 71-73.) On occasion, Warhurst indicated, she would deposit checks directly into the Davy Jones LLC's account. (*Id.* at 75.) However, she was never a member of that entity.

According to Warhurst, among the items she provided the Vessel were "a little robot vacuum that we had at home" that the Law Practice had purchased for $349 in December 2012 (*id.* at 31-33), a fishing reel purchased from Academy Sports for $439.99 on May 21, 2013 (*id.* at 38-39), a satellite television which was acquired by "an even trade" of Mr. Warhurst's reef permit (*id.* at 44-45), an Apple TV device purchased for $100 that the Warhursts "just had ... around" to connect to the Vessel's television to stream music and movies (*id.* at 63-64), a "big

---

[6]      In Warhurst's words, she was not concerned about this arrangement because "I know if anything goes awry, that I always have the net to fall back on of having a lien against the boat to get these supplies." (Warhurst Dep., at 20.) She reiterated this philosophy later in her deposition by explaining that "my hope was that the business would make money," but if the Vessel did not become profitable, "I had a second safety net, now that I could claim a lien." (*Id.* at 92-93.)

Yeti cooler" purchased for $1,018.45 (*Id.* at 61), another Yeti cooler purchased on June 1, 2013 for $502.14 (*id.* at 68-69), a Green Egg grill purchased for $624.24 (*id.* at 81), and two Shimano fishing rods valued at $300 that the Warhursts had previously maintained at their residence (*id.* at 86-87). Warhurst also identified numerous other line items as payments for Vessel-related supplies or repairs; however, she was unable to specify precisely how those funds were allocated. With respect to the Yeti coolers, the Green Egg grill, the Apple TV and so forth, Warhurst testified that she had "no idea" whether those items remained on the Vessel after Davy Jones LLC relinquished possession in September 2013. (*Id.* at 82.)

> ### D.     Services/Supplies Provided by Intervenor-Plaintiff Leith.

Plaintiff Kris Leith's involvement in this matter dates back to a time when Mr. Warhurst served as his lawyer in a personal injury case. (Leith Dep. at 12.) Upon resolution of that personal injury matter, Leith testified, "I had some money." (*Id.*) Mr. Warhurst then approached Leith because he "needed some stuff done" on the Vessel. (*Id.* at 13.) The idea, according to Leith, was that Leith would act as "kind of a silent partner with no money invested other than this." (*Id.*) Mr. Warhurst convinced Leith to "tie up my money" in the Vessel by telling him that his "interest in it would be protected" because he could bring a maritime lien if anything went wrong, "so you ain't got to worry about it." (*Id.* at 13-14.) The pitch to Leith was that "[w]e're going to make some money" and were "fixing to go make a million dollars" in this business venture in which Leith was participating. (*Id.* at 14.) As part and parcel of this arrangement, Leith attended business meetings with Davy Jones LLC members concerning the Vessel, at which time he provided input and suggestions on matters such as names, pictures, and advertising. (*Id.* at 13.) Leith "knew all of their business" and contrasted his situation with one in which a contractor "had no inside information." (*Id.* at 23.)

Based on this understanding, Leith purchased and installed seven security cameras on the Vessel. (*Id.* at 17.) He testified that he has "no idea what date" this work was performed. (*Id.* at 25.) Be that as it may, Leith testified, he provided these services as "kind of an investment" with the thought of "doubling your money" because he "had an extra two thousand" in cash because of the personal injury settlement. (*Id.* at 22.) Leith's understanding was that he would recoup his investment "[w]hen the boat started making money." (*Id.*) During his deposition, Leith repeatedly characterized his efforts for the Vessel as "an investment," explaining, "somebody comes into money like that, and they think you can make an investment …. I mean, you want to

invest money, you know." (*Id.* at 28.)  According to Leith, "I thought I was rich and was going to make some money." (*Id.*)  Leith never asked or expected to be compensated directly for his work on the Vessel until, in his words, "everything went to crap." (*Id.* at 23.)  He never made demand upon Mr. Warhurst or Davy Jones LLC to pay him for the work he had done. (*Id.* at 25.)

> **E.      Facts Pertaining to Plaintiffs' Preservation/Enforcement of Liens.**

On October 15, 2013, Davy Jones LLC – but not Beech, Warhurst or Leith – filed a lawsuit against B&D Maritime, Randy Boggs (an owner or officer of B&D Maritime) and David Jones (formerly a member of Davy Jones LLC) in the Circuit Court of Baldwin County, Alabama.  (Doc. 69, Exh. 1.)  Skipper's Landing was not originally named as a defendant in that case.  As initially pleaded, the complaint filed in that action (the "Baldwin County Complaint") alleged that B&D Maritime had breached the Lease/Agreement to Purchase, that Jones had breached his duty to Davy Jones LLC by becoming captain of the Vessel for B&D Maritime, that the defendants had wrongfully converted the Vessel and had been unjustly enriched thereby, and that Davy Jones LLC was entitled to an equitable lien on the Vessel for "amounts advanced and paid to [*sic*] by Plaintiff to Defendant for acquisition, charter and repairs to the vessel."  (Doc. 69, Exh. 1, at ¶ XXVII.)[7]  The Baldwin County Complaint did not reference (much less enumerate) any services and supplies allegedly provided by Beech, Warhurst and Leith, nor did it identify them as putative lienholders with respect to the Vessel.  A copy of the Baldwin County Complaint was served on Boggs on October 21, 2013.  (Doc. 63, Exh. 3.)

Prior to closing on the Vessel in October 2013, Skipper's Landing received no records, documents, correspondence or other communication reflecting that Beech, Warhurst and Leith had performed any work on, or provided any supplies or services for, the Vessel five months earlier, much less that they were claiming maritime liens for that work.  (Britt Dep., at 59-61.)  At some time, Skipper's Landing did review an abstract of title, which would have revealed any

---

[7]      The acrimonious nature of the parting of ways between David Jones and Gene Warhurst as members of Davy Jones LLC, is further exemplified by *Earnest E. Warhurst, Jr. v. One Twenty Foot Bertran, etc., in rem, and David L. Jones, in personam*, Civil Action 14-0245-N, a separate federal lawsuit between Mr. Warhurst and Jones filed in this District Court.  As the Court understands it, that case arose from a disagreement as to possession of another vessel owned by Mr. Warhurst as to which Jones performed repairs for which he had never been paid.  Following a non-jury trial, Magistrate Judge Nelson entered judgment in Jones' favor in March 2015.

recorded liens on the Vessel; however, no such items appeared on the document.  (*Id.* at 21; Boggs Dep., at 70.)[8]  Prior to closing, Skipper's Landing did not undertake to determine whether there were any unrecorded liens or other claims against the Vessel.  (Britt Dep., at 19, 21.)  Nor did Skipper's Landing endeavor to ascertain whether there were any pending lawsuits involving B&D Maritime at the time of that transaction.  (*Id.* at 22.)  Skipper's Landing did not review any of the Vessel's logs prior to closing on the sale, and its principal did not go onboard the boat until after it was purchased.  (*Id.* at 32-33.)  As Skipper's Landing's principal put it, "I didn't get anything, didn't ask for anything."  (*Id.* at 33.)  Skipper's Landing was not represented by counsel in this transaction.  (*Id.* at 21.)

## III.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

---

[8]   This result comes as no surprise, given that Beech, Warhurst and Leith had not recorded or caused to be recorded any such liens against the Vessel.

IV.     **Legal Analysis.**

The Motion for Summary Judgment advances seven separate grounds on which Skipper's Landing maintains that the Complaint should be dismissed.  The Court finds it necessary to address only two of these issues, to-wit: (i) movant's contention that plaintiffs are not strangers to the Vessel and therefore lack valid maritime liens; and (ii) movant's argument that plaintiffs' maritime liens (if any) were rendered unenforceable by operation of the equitable doctrine of laches.  These two issues are, independently and collectively, dispositive of the pending Rule 56 Motion in its entirety.

A.     ***Plaintiffs Are Not Strangers to the Vessel.***

1.     *Governing Legal Principles.*

Central to plaintiffs' *in rem* claim against the Vessel is their contention that each of them holds a valid maritime lien.  The Maritime Commercial Instruments and Liens Vessel Identification Systems Act of 1988 specifies that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner … has a maritime lien on the vessel." 46 U.S.C. § 31342.  An important limitation to this general rule is that it applies only to strangers to the vessel.  Indeed, the law is unequivocal that joint venturers are not entitled to, and cannot obtain, maritime liens.  *See, e.g., Rose v. M/V "GULF STREAM FALCON,"* 186 F.3d 1345, 1348 (11th Cir. 1999) ("It is true that joint venturers generally are not entitled to a lien for 'necessaries' provided because they occupy a position akin to an owner. … Conversely, a 'stranger' to the vessel is entitled to a maritime lien for 'necessaries' provided to a vessel because a 'stranger' relies on the credit of the vessel, and not on the credit of the co-venturer.") (citations omitted); *Fulcher's Point Pride Seafood, Inc. v. M/V Theodora Maria*, 935 F.2d 208, 211 (11th Cir. 1991) ("While the presumption in favor of a maritime lien is strong, joint venturers cannot hold maritime liens because they are not strangers to the vessel.") (citations and internal marks omitted).[9]

---

[9]     *See also Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1208 (5th Cir. 1978) ("Joint venturers cannot hold maritime liens because they are not strangers to the vessel, … but rather occupy a position akin to that of the vessel's owner.") (citation and internal quotation marks omitted); *Mullane v. Chambers*, 438 F.3d 132, 137 (1st Cir. 2006) ("maritime liens, created pursuant to the rule of advances or any other theory, are intended to safeguard the interests of 'strangers to the vessel,' not vessel owners or those who can control the vessel's affairs"); *In re SeaEscape Cruises Ltd.*, 191 B.R. 944, 947 (S.D. Fla. 1995) ("[S]hipowners, joint (Continued)

From a policy standpoint, in the maritime lien system, "[t]he overarching goal is keeping the channels of maritime commerce open – by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation." *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006). That objective is simply not promoted by conferring maritime liens upon persons who own or otherwise have the ability to control or influence the affairs of a vessel.[10] Furthermore, the "strangers to the vessel" prerequisite for maritime liens "is justified because of the equities involved; that is, those who share the responsibility for incurring the debts of the vessel ought not be reimbursed out of that vessel's proceeds to the detriment of other lienholders." *Hinson v. M/V CHIMERA*, 661 F. Supp.2d 614, 619 (E.D. La. 2009) (citation and internal quotation marks omitted); *see also Ridinger v. 33' Speedboat, Hull ID Number: EMO0331169A89*, 2009 WL 2030237, *3 (S.D. Fla. July 9, 2009) (similar).

Skipper's Landing's Motion for Summary Judgment takes the position that Beech, Warhurst and Leith were all joint venturers with Davy Jones LLC, and that they therefore are not strangers to the Vessel and are ineligible to hold maritime liens against it. To determine whether a person furnishing necessaries to a vessel is a joint venturer (and, hence, not a stranger to the vessel), binding appellate precedents have examined the following considerations:

> "The parties' intentions are important. Joint ventures involve joint control or the joint right of control. Both venturers share in the profits, and both have a duty to share in the losses. But of course these elements cannot be applied mechanically. No one aspect of the relationship is decisive."

---

venturers, investors or shareholders in a shipowning corporation cannot have a valid maritime lien on a vessel in which they own an interest."); *Fathom Expeditions, Inc. v. M/T Gavrion*, 402 F. Supp. 390, 397 (M.D. Fla. 1975) ("joint venturers are not entitled to a maritime lien for furnishing supplies, repairs or labor").

[10]   "The purpose of a maritime lien, therefore, is to encourage the provision of goods and services, especially in distant ports, by providing an *in rem* claim against the vessel itself should the party controlling the vessel's affairs abscond. ... Since owners are the ones that control the vessel's affairs, or have access to the entity that controls the vessel's affairs, they do not require such a mechanism." *L & L Electronics, Inc. v. M/V OSPREY*, 764 F. Supp.2d 270, 273 (D. Mass. 2011) (citations omitted).

*Fulcher's Point*, 935 F.2d at 211 (citation omitted); *see also Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1208 (5th Cir. 1978) (elements for joint venture include the parties' intentions, joint right of control, joint proprietary interests in subject matter of venture, and sharing of profits and losses).  Significantly, factors such as joint control, joint proprietary interest, and sharing of profits/losses "are not a checklist.  They are only signposts, likely indicia, but not prerequisites." *Fulcher's Point*, 935 F.2d at 211.  Indeed, "the factors that indicate the existence of a joint venture do not have to be met point for point." *Id.*  The old Fifth Circuit provided helpful illumination on this concept by opining as follows:

> "Perhaps the best example of a joint venturer would be a party whose prospective gains resemble the owner's, who has the owner's prerogatives, and who might otherwise appear to investigating creditors to be a part owner.  Such a party may, of course, have an *in personam* contract claim against the true owner.  But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself."

*Sasportes*, 581 F.2d at 1208-09.

Application of these principles to uncontroverted facts regarding each plaintiff's relationship to the Vessel lends considerable support to the notion that they are joint venturers whose interests were directly aligned with Davy Jones LLC.  Plaintiffs are therefore ineligible to hold maritime liens against the Vessel.[11]

### 2.   *Plaintiff Beech Was Not a Stranger to the Vessel.*

Beginning with plaintiff Adam Beech, the summary judgment record leaves no doubt that his arrangement with Mr. Warhurst / Davy Jones LLC was that Beech would perform cabin

---

[11]   This "stranger to the vessel" argument was the centerpiece of the Motion for Summary Judgment.  It was the lead ground for relief presented in the Motion, for which briefing consumed roughly 7 pages of the 24-page filing.  In their individual response briefs (docs. 69, 70 & 71), however, plaintiffs do not address or rebut the "stranger to the vessel" issue in any meaningful way.  They do not argue that they should not be legally classified as joint venturers.  They do not present facts challenging or questioning defendant's portrayal of them as insiders and *de facto* part owners of the Vessel during the interval in which Davy Jones LLC was an agreed buyer in possession of same.  This omission is at plaintiffs' peril.  *See, e.g., Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) (noting that a litigant "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions") (citation omitted).

renovation services in exchange for a $25,000 interest in the Vessel and the expected charter fishing operation for which Davy Jones LLC would employ the Vessel.  Beech never submitted invoices for reimbursement for his work on the Vessel because he understood and intended that he was performing said work in exchange for a share of the business.  By Beech's own admission, the work he did on the Vessel constituted an "initial investment" that gave him a "stake of interest in that business."  His understanding and arrangement was that if the charter fishing business prospered, then he "would begin to draw a percentage of profits out of it."  In the vernacular of *Sasportes* and *Filcher's Point*, these facts establish that Beech's position was akin to that of part-owner in the Vessel.  He had a proprietary interest in the success of the charter fishing business for which that Vessel was to be used, and expected to receive a stream of profits from that business in exchange for his labor and supplies to the Vessel.  At the very least, Beech looked, thought and expected to profit like an owner of the Vessel; therefore, the Court agrees with Skipper's Landing that Beech had the legal status of a joint venturer who was not a stranger to the Vessel and therefore could not hold a maritime lien against it.

> 3.    *Plaintiff Warhurst Was Not a Stranger to the Vessel.*

With respect to plaintiff Tenley Warhurst, a multitude of considerations favor treating her as a joint venturer, rather than a stranger to the vessel.  First, she is married to Gene Warhurst, who was not only a member of Davy Jones LLC (the agreed buyer in possession of the Vessel), but also the individual making arrangements for labor, supplies and services to be done on the Vessel during the relevant time period.[12]  Stated differently, Warhurst's marital relationship to the person who was exercising control and dominion over the Vessel makes her in many ways the ultimate insider with respect to the Vessel.  She had access to (and identity of personal, legal and financial interest with) the person who was acting to control the Vessel's affairs during the interval in which she was furnishing necessaries to the Vessel.  Under those circumstances,

---

[12]    Plaintiffs readily acknowledge that Mr. Warhurst "was, at all times material, a buyer in possession of the MV WISHBONE at the time the work was performed."  (Doc. 69, at 3.)  There are thus no material disputed facts as to Mr. Warhurst's role *vis-à-vis* the Vessel during the time period in question.

Warhurst cannot reasonably be viewed as a "stranger to the Vessel" who might be eligible to assert a maritime lien.[13]

Second, Warhurst's deposition testimony reveals that the expenditures for which she seeks maritime lien status consist to a large degree of commingled (and often hopelessly entangled) resources.  Many of the services and supplies for which Warhurst claims a maritime lien were purchased using joint marital credit cards, funds or accounts belonging to both Warhurst and Mr. Warhurst (who, again, was one of two members of the LLC in possession of the Vessel and a person exercising control and dominion over all aspects of the Vessel's restoration, repairs, outfitting and finances during the lease period).  Certain of the supplies encompassed within Warhurst's maritime lien claim were marital property maintained in the marital home and subsequently moved onboard the Vessel.  The "loans" for which Warhurst seeks compensation in her maritime lien were made to Mr. Warhurst's law practice and were not earmarked for any particular purpose.  In lieu of repaying Warhurst directly for those loans, the Law Practice (by and through its bookkeeper, who was none other than Warhurst herself) invested those funds in services and supplies for the Vessel.  The tangled, commingled finances of Warhurst's contributions to the Vessel underscore her status as an insider to the Vessel, with direct access to (and influence over) the person and LLC that controlled the Vessel's affairs, and her lack of any reasonable need for an *in rem* claim against the Vessel to protect her if the parties controlling the Vessel's affairs (*i.e.*, her husband and her husband's LLC) absconded.[14]

---

[13]     Plaintiff Warhurst's case appears to hinge on the premise that a spouse of the agent in possession and control of the Vessel can nonetheless constitute a stranger to the vessel for purposes of obtaining and enforcing maritime liens.  However, plaintiffs have identified no legal authority that might support such a notion, which runs directly contrary to the principles enunciated in *Sasportes, Fulcher's Point*, and the other cases identified *supra*.  Indeed, even a common-sense assessment of the arrangement inexorably prompts the conclusion that Warhurst was anything but a stranger to the F/V WISHBONE.

[14]     To sharpen the point, it bears emphasis that Warhurst was the Law Practice's bookkeeper.  In this capacity, she had direct control over the means to reimburse herself for each loan she made to the Law Practice that was subsequently funneled to the Vessel for services and supplies.  If Warhurst wanted to be repaid for such funds, she had only to write herself a check from the Law Practice.  This arrangement demonstrates that Warhurst falls well outside the category of persons whom the maritime lien mechanism is designed to protect and encourage to make contributions to vessels.

Third, Warhurst's own characterization of her relationship with the contemplated charter business for the Vessel reinforces the conclusion that she is properly classified as a joint venturer, rather than a stranger to the vessel.  She testified that her arrangement with Mr. Warhurst / the Law Practice / Davy Jones LLC meant that she "was kind of vested in this boat venture after we got it going."  Warhurst explained that her motivation in allowing her loans to the Loan Practice to be repaid via investment in the Vessel rather than disbursements to her was "to get that business up and going as fast as possible to be able to make some money at that business."  She also testified to her hope that she would "be able to participate more" and help "run the business" after it went into effect.  These sentiments further cement the undersigned's conclusion that, taking the summary judgment record in the light most favorable to plaintiffs, Tenley Warhurst was properly classified as a joint venturer, and not a stranger, with respect to the F/V WISHBONE and the contemplated charter fishing business that her husband and his business associates were undertaking to establish.  That determination deprives Warhurst of the legal right to hold and enforce a maritime lien against the Vessel.

4.    *Plaintiff Leith Was Not a Stranger to the Vessel.*

Intervenor-plaintiff Kris Leith is similarly situated to both Beech and Warhurst with respect to the "stranger to the vessel" issue.  Leith's deposition testimony reveals that he had come into some money as a result of a settlement in a personal injury case in which Mr. Warhurst represented him.  Because of that windfall and his personal circumstances (an ongoing and apparently contentious divorce proceeding), Leith was looking to invest that money.  Mr. Warhurst approached him with the idea of having Leith "tie up [his] money" in the Vessel, offering grand forecasts of how much money they were going to make in the charter fishing venture.  Leith provided labor and supplies to the Vessel under these circumstances.  His understanding and intention was that he worked on the Vessel as "kind of an investment," and Leith testified to his expectation that he "was going to make some money" in this deal.  Leith contemplated that he would recoup his investment "[w]hen the boat started making money."  What's more, Leith attended and participated in business meetings concerning the Vessel, offering his own suggestions and input on matters such as advertising plans for the charter fishing business.  By his own admission, Leith "knew all of their business," in terms of Davy Jones LLC's plans and activities concerning the Vessel.  These circumstances, taken in the aggregate, cast Leith in the light of a joint venturer who possessed joint control (or at least input)

-14-

as to the Vessel, a joint proprietary interest in the Vessel, and an expectation of sharing in proceeds of the contemplated charter fishing business involving the Vessel.  On this record, the Court finds no genuine issues of disputed fact, and concludes that plaintiff Leith is properly deemed a joint venturer, and not a stranger to the Vessel, and that he therefore cannot pursue maritime lien claims in this litigation.

>            5.    *Conclusion.*

As shown by the foregoing discussion, none of the three plaintiffs in this case were positioned as arm's-length vendors providing labor and supplies to the Vessel.  To the contrary, all were insiders, making investments in the Vessel in the hope of reaping a profit once the charter fishing business got up and running.  Far from billing Davy Jones LLC for their labor and supplies, plaintiffs never asked to be paid, and instead treated their work as an investment from which they expected to profit once the charter fishing business came to fruition.  All of them occupied positions akin to (and fully aligned with) that of the Vessel's agent in possession.  Their prospective gains resembled those of Mr. Warhurst and Davy Jones LLC.  Whether they considered themselves to be joint venturers or not, all of their actions and all of the details of their arrangements with Mr. Warhurst and Davy Jones LLC created the appearance that they were just that.  At some point, those appearances must be accepted as reality.  *See Fulcher's Point*, 935 F.2d at 213 ("Though we do not suggest it as a legal principle, some merit lies with the old saw that what looks, walks and quacks like a duck is probably a duck.").

Furthermore, plaintiffs' prior arrangements with Mr. Warhurst / Davy Jones LLC and their calls for enforcement of maritime liens against said Vessel in this litigation demonstrate a have-your-cake-and-eat-it-too mindset.  Each plaintiff contemplated that he or she was investing in a business enterprise.  If that enterprise succeeded, then plaintiffs expected to make money.  If it failed, however, plaintiffs' testimony reveals that each of them expected to recoup his or her initial investment in the business from the Vessel itself.  Stated differently, the three plaintiffs in this case invoke the doctrine of maritime liens not to provide essential protections to them for the goods and services they provided to the Vessel, but to hedge their "investment" in a business that never got off the ground.  The doctrine of maritime liens was not created as a means of ensuring that investors in maritime-related activities could enjoy the upside without fear of any potential downside.  Our system of maritime liens does not exist to give part owners a safety net or a guarantee of a risk-free investment if a vessel-related business enterprise stumbles out of the

gate, or fails altogether.  *See Sasportes*, 581 F.2d at 1209 ("when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor").  Yet each plaintiff testified with remarkable candor that this is precisely what he or she sought to achieve.

Maritime liens are not available to insiders, part-owners, and investors in vessels and vessel-related business enterprises.  Rather, their function is to protect and incentivize third-party outsiders to supply necessaries to vessels, secure in the knowledge that they may obtain recompense for their labors even if the vessel owners leave them in the lurch.  Uncontroverted record evidence establishes that plaintiffs, and each of them, fall squarely in the first category, not the second.  Each plaintiff had direct access to, and special relationships with, the agent in control of the Vessel.  Each plaintiff's interests were aligned with, and identical to, those of Davy Jones LLC.  And each asserted a maritime lien against the Vessel only after their business venture failed, without ever seeking to collect from Mr. Warhurst or Davy Jones LLC, the person / entity that retained them to contribute to the Vessel in the first place.  As such, the Court concludes that the Motion for Summary Judgment is properly **granted** on the ground that plaintiffs do not qualify as strangers to the vessel, and therefore are not properly classified as maritime lienholders.

### B.    *Laches.*

As a separate, independent ground for the Motion for Summary Judgment, Skipper's Landing maintains that plaintiffs' claims should be dismissed pursuant to the doctrine of laches.

"Laches is a defense sounding in equity that serves to bar suit by a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant."  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1283 (11th Cir. 2015) (citations and internal quotation marks omitted).  "It is well settled that a claim asserting a maritime lien can be barred by laches."  *John W. Stone Oil Distributor, Inc. v. M/V Miss Bern*, 663 F. Supp. 773, 778 (S.D. Ala. 1987).[15]  At issue here are both the reasonableness of plaintiffs'

---

[15]    *See also Bermuda Express, N.V. v. M/V Litsa (Ex. Laurie U)*, 872 F.2d 554, 558 (3rd Cir. 1989) ("Both at common law and under the statute, however, maritime liens may be lost by laches in their prosecution."); *Gammill v. Bradley T*, 879 F. Supp. 737, 741 (W.D. Ky. 1995) ("Where a claim is brought *in rem* against a vessel owned by a bona fide purchaser for value without notice of the claim, the party bringing the claim must have exercised reasonable (Continued)

delay in asserting their maritime liens against the Vessel and the prejudice (or lack thereof) to Skipper's Landing occasioned by that delay.

In furtherance of the "unexcused delay" factor, Skipper's Landing points to uncontested facts that plaintiffs provided services and supplies to the Vessel in May 2013, yet they never asserted maritime lien claims arising from those activities until filing their Complaint in this action on May 29, 2014, fully one year later. During the interim, of course, there was a change in ownership, as B&D Maritime sold the Vessel to Skipper's Landing in October 2013. This fact is important to the laches analysis. After all, "[t]he claim will lapse in a much shorter time and the court will undertake a more rigid scrutiny of the circumstances of the delay in cases where the vessel is in the hands of a bona fide purchaser as opposed to cases where there has been no change in ownership." *John W. Stone*, 663 F. Supp. at 778; *see also A/S Dan-Bunkering Ltd. v. M/V Zamet*, 945 F. Supp. 1576, 1580 (S.D. Ga. 1996) ("innocent owners in the position of a bona fide purchaser who had no notice of a lien incurred against the vessel prior to purchasing it can generally assert the laches defense"). It is undisputed that Skipper's Landing was a bona fide purchaser of the Vessel.

What is challenged on summary judgment is whether Skipper's Landing was on notice of the maritime lien claims of Beech, Warhurst and Leith at the time of the closing. The summary judgment record in the light most favorable to plaintiffs confirms that Beech, Warhurst and Leith never contacted or communicated to Skipper's Landing to alert it to their purported maritime liens prior to the October 17, 2013 purchase agreement for the Vessel. The record likewise reflects that Skipper's Landing was unaware that Beech, Warhurst and Leith had provided services and supplies to the Vessel five months earlier for which they had not received recompense. It is undisputed that, at some time, Skipper's Landing reviewed an abstract of title, which would have revealed recorded liens on the Vessel (had there been any), but none appeared. All of these facts and circumstances point unambiguously to a lack of notice to Skipper's Landing.

---

diligence in pursuing the claim. Laches can operate to bar such a claim where unreasonable delay in pursuing the claim results in prejudicial harm to the owner.").

In response, plaintiffs insist that "Skipper's Landing Inc. was, in fact, on *notice* of potential claims against the MV WISHBONE at the time of purchase." (Doc. 69, at 8.) Plaintiffs reason that Skipper's Landing entered into the purchase agreement to buy the Vessel on October 17, 2013, some two days after Davy Jones LLC filed the Baldwin County Complaint against B&D Maritime, its owner (Randy Boggs) and David Jones. This reasoning is unconvincing in multiple respects. First, plaintiffs do not identify any reasonably available mechanism through which Skipper's Landing could or should have ascertained the existence of the Baldwin County Complaint prior to entering into the October 17, 2013 purchase agreement for the Vessel. After all, neither the Vessel nor Skipper's Landing were named as parties in that pleading, and there is no allegation or evidence that Davy Jones LLC undertook to serve the Baldwin County Complaint on Skipper's Landing at that time. Second, uncontroverted record evidence demonstrates that B&D Maritime and Boggs were not served with the Baldwin County Complaint until October 21, 2013, four days after execution of the Skipper's Landing agreement; therefore, Skipper's Landing could not have learned about the particulars of that action by inquiring of the seller, because the seller had not yet been served when Skipper's Landing agreed to purchase the Vessel.

Third, even if Skipper's Landing could have obtained and reviewed the Baldwin County Complaint prior to the October 17 purchase agreement, nothing in that document would have put Skipper's Landing on notice that Beech, Warhurst and Leith were asserting maritime liens. The Baldwin County Complaint does not name those individuals, much less specify that any of them claimed to be owed money for necessaries provided to the Vessel five months earlier. In short, that document would not have afforded Skipper's Landing the requisite notice, even if it had been reasonably possible for Skipper's Landing to locate and review the Baldwin County Complaint during the 48-hour gap between its filing in state court and Skipper's Landing's execution of the purchase agreement. For these reasons, the Court rejects as factually and legally unsupported plaintiffs' contention that Skipper's Landing was on notice of their maritime lien claims when it agreed to purchase the Vessel from B&D Maritime.[16]

---

[16]     Plaintiffs' argument leans heavily on the following passage from the Baldwin County Complaint: "[T]he parties hereto as joint owners of the vessel as aforesaid are unable to agree on … a plan for repayment of the amounts advanced and paid to [*sic*] by Plaintiff to Defendant for acquisition, charter and repairs to the vessel." (Doc. 69, Exh. 1, at ¶ XXVII.) (Continued)

Not only was Skipper's Landing a bona fide purchaser of the Vessel without notice, but there is no dispute that the liens claimed by Beech, Warhurst and Leith are unrecorded.[17]  Under these circumstances, a maritime lienholder is required to demonstrate a "high degree of diligence" to preserve the lien against a laches defense.[18]  In examining whether a lienor has

--------

Plaintiffs insist that this allegation is "broad enough" to place Skipper's Landing on notice "of the factual basis of the maritime lien claims asserted herein for claims arising from charter and repairs to the vessel for the lien claimants Adam Beech, Tenley Warhurst and Kris Leith." (Doc. 69, at 9-10.)  The Court disagrees.  The quoted allegation in the Baldwin County Complaint states that Davy Jones LLC (the only named "Plaintiff" in that case, as originally filed) had an equitable lien for amounts that the LLC paid for acquisition, charter and repairs to the Vessel.  Under no reasonable construction can that language be construed as alluding to claims for maritime liens asserted by Beech, Warhurst and Leith for services and supplies that they provided the Vessel.  By conflating Davy Jones LLC with Beech/Warhurst/Leith for purposes of this argument, plaintiffs seem to be suggesting that they were all one and the same, which is of course why those three plaintiffs do not qualify as strangers to the Vessel and cannot hold maritime liens in the first place.  As agent in control of the Vessel, Davy Jones LLC certainly could not (and did not) assert a maritime lien against it.  The bottom line is that no reasonable purchaser in Skipper's Landing's position could have surmised from reading the referenced portion of the Baldwin County Complaint that there were any potential maritime lien claims on the Vessel, much less that Beech, Warhurst and Leith claimed $54,000 in maritime liens for necessaries provided during the period in which Davy Jones LLC had leased the Vessel.  Thus, even if Skipper's Landing reasonably could or should have been aware of the Baldwin County Complaint prior to purchasing the Vessel (which it was not), that document failed to place it on notice of maritime lien claims.

[17]     To be sure, plaintiffs are correct that "it is not a mandatory requirement that the lien be recorded."  (Doc. 69, at 7.)  As Judge Daniel Holcombe Thomas explained more than a quarter century ago, "[t]he Federal Maritime Lien Act ... does not require the recording of liens."  *John W. Stone*, 663 F. Supp. at 778.  But Skipper's Landing never argued otherwise.  Instead, Skipper's Landing's point (which is also legally accurate) is that the failure of a maritime lienor to record said lien is an appropriate factor in the laches analysis.  *See id.* (opining that issue of whether maritime lien was recorded or not is "relevant to a determination of whether a lien is barred by laches").

[18]     "The standard of diligence required by the holder of an unrecorded lien against a bona fide purchase of a vessel is a high degree of diligence."  *Tagaropulos, S.A. v. S.S. Santa Paula SS Hans Isbrandtsen*, 502 F.2d 1171, 1172 (9th Cir. 1974) (citing *Merchants & Marine Bank v. The T.E. Welles*, 289 F.2d 188, 190 (5th Cir. 1961)); *see also Liverpool and London S.S. Protection & Indem. Ass'n Ltd. v. M/V ABRA*, 295 F. Supp.2d 674, 691 (M.D. La. 2003) ("in cases where the vessel has been sold to a bona fide purchaser, the holder of the unrecorded lien must exert a 'high degree of diligence' to preserve the lien").

"exercised the high degree of diligence required" to enforce a maritime lien against a bona fide purchaser without notice, courts "consider the following factors: (1) did the lienholder file a notice of claim of lien in the vessel's homeport …; (2) did the lienholder fail to arrest the vessel when he had the opportunity to do so; and, (3) did the lienholder wait for a time longer than that permitted by analogous state statutes of limitation before filing his action to enforce his lien?" *John W. Stone*, 663 F. Supp. at 779; s*ee also Gammill v. Bradley T*, 879 F. Supp.2d 737, 741 (W.D. Ky. 1995) (applying *John W. Stone* factors in assessing lienor's diligence in bringing claim).  None of those factors support a finding of diligence by Beech, Warhurst and Leith.  The uncontroverted evidence shows that they failed to file a notice of claim of lien against the F/V WISHBONE in Orange Beach, Alabama; that they could have arrested the Vessel at any time prior to the October 17 date of the Skipper's Landing purchase agreement, but did not; and that they waited well beyond the expiration of the analogous state statute of limitations before filing suit.[19]

On these facts, the Court readily concludes that Beech, Warhurst and Leith did not act with the requisite "high degree of diligence" to protect and enforce their maritime liens against a bona fide purchaser for value without notice.  Simply put, plaintiffs engaged in inexcusable and unreasonable delay in asserting their maritime lien claims, a determination which favors the equitable defense of laches.[20]

---

[19]     The relevant Alabama statute providing for a lien on watercraft "for work done, or material supplied by any person within this state" is found at Alabama Code § 35-11-60.  An action to enforce a lien under § 35-11-60 "must be commenced within six months after the demand becomes due; and unless commenced within that time, the lien is lost."  Ala. Code § 35-11-6.  This statutory scheme thus creates a six-month limitations period for enforcement of the analogous state-law lien on watercraft.  Plaintiffs tarried (without explanation) until long after the sunset of that limitations period before filing suit against the Vessel; indeed, they did not commence litigation until a full year after the alleged maritime liens accrued.  That fact is not dispositive of the laches analysis, but it certainly is relevant.  *See, e.g., John W. Stone*, 663 F. Supp. at 779 ("Although this court is not bound by any state statute of limitations, the fact that a state statute bars the cause of action can be considered when the equitable defense of laches is asserted.").

[20]     Plaintiffs are sharply critical of what they describe as Skipper's Landing's lack of diligence in investigating the presence or absence of maritime liens or claims on the Vessel prior to agreeing to purchase it.  Courts have deemed that factor relevant to the overall equities of the laches inquiry.  *See, e.g., Bermuda Express*, 872 F.2d at 560 ("A balancing of the equities requires consideration not only of the bona fides of the purchaser, i.e., its lack of actual (Continued)

The remaining question for purposes of the laches analysis is whether Skipper's Landing was prejudiced by plaintiffs' inexcusable delay and lack of diligence in asserting maritime lien claims against the Vessel. *See Garrett Const. Co. v. Knowles*, 2006 WL 237070, *5 (S.D. Tex. Jan. 31, 2006) ("Laches requires a factual inquiry into the effect of defendants' delay and the resulting prejudice to plaintiff."). Prejudice may not reasonably be disputed in this case. After all, Skipper's Landing agreed to buy the Vessel from B&D Maritime for $60,000, while being entirely unaware that Beech, Warhurst and Leith were claiming maritime liens against the Vessel in the total amount of an additional $54,000. Not only that, but Skipper's Landing spent approximately $75,000 in parts, materials and labor to repair and refurbish the Vessel after purchasing it (Britt Dep., at 67), all without knowledge or notice that plaintiffs were biding their time to interpose sizeable maritime lien claims against that Vessel. The prejudice to Skipper's Landing from the lack of notice of liens almost equaling the agreed purchase price when Skipper's Landing bought and invested considerable additional funds in the Vessel is both obvious and self-evident, and has not been seriously challenged by plaintiffs.[21]

---

knowledge of unpaid liens and its search of the ship's registry, but also of its efforts to ascertain whether, in light of the absence of any legal requirement of filing liens, there are in fact liens outstanding."). On that point, plaintiffs are quite right that Skipper's Landing could have investigated further before entering into the agreement to purchase the Vessel from B&D Maritime. Where this argument breaks down, however, is that plaintiffs have not shown, and cannot show, that any such reasonable inquiry would have alerted Skipper's Landing to the existence of the maritime lien claims of Beech, Warhurst and Leith (none of which were recorded or otherwise documented in a place where Skipper's Landing could have accessed or become aware of them upon reasonable inquiry). Simply put, further inquiry would have accomplished nothing. Skipper's Landing would have remained unaware of the pendency of plaintiffs' lien claims against the Vessel at the time the purchase agreement was finalized; therefore, the Court will not penalize Skipper's Landing in the balancing of equities for not engaging in what would have been a fruitless, futile endeavor to investigate the lien status of the Vessel prior to purchasing it. Similarly, the Court declines to speculate, as plaintiffs do, that "[s]ome notice of the unpaid work for repairs and improvements to the boat may be inferred" by Skipper's Landing's hiring of David Jones as captain after purchasing the F/V WISHBONE. (Doc. 69, at 10.) Plaintiffs point to no record evidence reasonably supporting any such inference, and courts do not indulge unvarnished conjecture by nonmovants on summary judgment.

[21]    There is a strand of authority providing that "[h]e who would invoke laches must show a delay which has subjected him to a disadvantage in asserting and establishing his claimed right or defense." *Esso Int'l, Inc. v. S.S. Captain John*, 443 F.2d 1144, 1150 (5th Cir. 1971). (Continued)

In short, the Court concludes that even if Beech, Warhurst and Leith possessed valid maritime lien claims against the F/V WISHBONE (which they do not, by operation of the stranger to the vessel doctrine), those claims would still be properly dismissed by straightforward application of the equitable doctrine of laches. This determination is informed by plaintiffs' delay in asserting such claims, plaintiffs' lack of diligence in pursuing and preserving same, and the resulting prejudice to Skipper's Landing, a bona fide purchaser for value without notice.

**V.      Conclusion.**

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 63) is **granted**. Plaintiffs' maritime lien claims are **dismissed** in their entirety for the separate, independent reasons that (i) plaintiffs were not strangers to the Vessel and therefore were not eligible to hold maritime lien claims against it, and (ii) even if plaintiffs were valid lienholders, their liens were barred by laches because plaintiffs failed to exercise reasonable diligence in preserving those liens, to the detriment of a bona fide purchaser without notice.

There being no other claims presented, the Complaint of plaintiffs Adam Beech and Tenley Warhurst, and the Complaint in Intervention of plaintiff Kris Leith, are **dismissed with prejudice**. A separate judgment will enter.

DONE and ORDERED this 15th day of June, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

Under this formulation of the standard, Skipper's Landing has also been prejudiced. With the passage of time, plaintiffs' memories about what exact work they did, how much it cost, which supplies were purchased and for how much, and even when the work was done have become spotty at best. Plaintiffs' vagueness and lack of specific recollection as to these details places Skipper's Landing at an acute disadvantage in defending against their maritime lien claims. Had plaintiffs timely and diligently pursued such claims, Skipper's Landing could have obtained their deposition testimony before plaintiffs' memories faded and before plaintiffs' records, invoices and receipts were destroyed or lost. In short, Skipper's Landing has adequately demonstrated that plaintiffs' delay in interposing their claims against the Vessel has impaired Skipper's Landing's ability to marshal and scrutinize pertinent evidence bearing on those claims. That fact constitutes prejudice for purposes of the laches analysis.